UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIS ALBERTO MONTALVO BORGOS, | * |
| Petitioner, | * |
| v. | * |
| | * Criminal No. 13-cv-12750-IT |
| GARY RODEN, | * |
| Respondent. | * |

MEMORANDUM & ORDER

April 20, 2017

TALWANI, D.J.

Petitioner Luis Alberto Montalvo Borgos ("Petitioner") is serving a life sentence for the 2007 murder of Jerome Woodard. Pet'r Mem. Law Supp. Writ Habeas Corpus Pursuant 28 U.S.C. § 2254 ("Mem. Supp. Pet.") 2 [#23]. In his petition for a writ of habeas corpus under 28 U.S.C. § 2254, he alleges that the Massachusetts Supreme Judicial Court ("SJC") violated clearly established federal law when it affirmed Petitioner's conviction. Per Petitioner, his constitutionally protected due process rights were violated because a photographic array used to identify him was unreasonably suggestive and caused a substantial likelihood of misidentification. Id. at 22-23. Petitioner also argues that two witness identifications were inherently unreliable because the witnesses each initially selected the wrong person, and one of the eyewitnesses lied to police, and that the failure to suppress the unreliable identifications violated his due process rights. Id. at 19-22. For the following reasons, Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition") [#1] is DENIED.

I.   Facts

Petitioner has not challenged the facts as found by the SJC:

On Friday, May 11, 2007, the victim; his girl friend, Sheena Castle; and their daughter, who was four years of age, went to Fall River to visit Castle's mother, Sharon St. Pierre. St. Pierre lived in an apartment on the second floor of a three-story apartment building. Jose Mercado Matos, known as Jolky, and his then girl friend, known as Liz, lived in an apartment above St. Pierre.[1] Jolky's twin brother, Osvaldo Mercado Matos, known as Valdo,[2] and his girl friend,[3] lived across the hall from Jolky. Yanelly Lorenzi[4] and her boy friend, Raymond Cordeiro, lived in an apartment under St. Pierre. Cordeiro, who had a heroin "problem" and had previously spent time in prison for selling drugs, was friends with the third-floor residents. Jolky and Valdo were known to sell drugs.

After arriving at St. Pierre's home, the victim, Castle, and their daughter went out to visit a friend. At about 9 or 10 P.M., St. Pierre went to bed. Meanwhile, in the apartment building next to St. Pierre's, Valdo went to visit Eduardo Rosario, who lived in a third-floor apartment with his wife, Vilmarie. At around 10 P.M., the men started drinking and watched television in the living room. Vilmarie had gone to bed. As the evening progressed, Valdo became increasingly intoxicated.

Sometime after 1 A.M., now May 12, the victim, Castle, and their daughter returned to St. Pierre's apartment building. For a while, the couple talked inside the victim's automobile, which was parked in front of St. Pierre's apartment. Eventually, the couple got out of the automobile, and as they did, the victim accidentally set off its alarm.

Although the victim shut the alarm off within seconds, the noise agitated Valdo, who began shouting out of Rosario's third-floor window. Valdo called the victim racist slurs and said, "I got something for you." The argument lasted about fifteen minutes. From a window of her apartment, Liz tried to stop the argument. Hearing the noise, St. Pierre telephoned 911, but hung up. The victim, Castle, and their daughter went inside.

Soon thereafter police arrived at St. Pierre's apartment to investigate the aborted 911 telephone call. St. Pierre lied to the officers, telling them that her granddaughter had made the telephone call while she was "playing with the

---

[1] The SJC inserted a footnote which read: "The defendant was staying with them."
[2] The SJC inserted a footnote which read: "We will refer to some witnesses by their first names."
[3] The SJC inserted a footnote which read: "Valdo's girl friend was the sister of Jolky's girl friend."
[4] The SJC inserted a footnote which read: "Yanelly, prior to trial, went by the name Monica Irene because there were warrants out for her arrest. Neither she nor her sister, Leisa, who also testified at trial, was truthful initially about Yanelly's true identity."

2

phone." The police left and St. Pierre locked the door. Within minutes St. Pierre and Castle saw the defendant, who they subsequently identified in a photographic array, break through the door, yell at the victim in Spanish, and point a gun at him. As St. Pierre and Castle fled, they heard multiple gunshots. The victim died as a result of gunshot wounds to his torso with perforations to his heart, lung, and pelvic bone.

St. Pierre and Castle were not the only persons who had information concerning the shooting. Just after the police left St. Pierre's apartment, at around 2:50 A.M., Liz saw the defendant outside yell up to Valdo, who was still in Rosario's apartment. Liz testified[5] that she heard the defendant ask Valdo, who was in Rosario's apartment, what was going on. Valdo told the defendant that the victim was "messing" with him. The defendant stated that he was going to kill the victim. Liz interjected, asking why the defendant would do that when the victim "didn't do nothing to him." The defendant replied that he did not care. The defendant did not like the victim and found him to be "disrespectful." After this exchange, the defendant went into St. Pierre's apartment building. Liz heard multiple shots coming from St. Pierre's apartment.

Rosario's account was similar. The defendant yelled up to Valdo and asked what was going on. Rosario testified that Valdo replied, "I don't know ... but I will fix it tomorrow." Rosario saw the defendant go inside St. Pierre's apartment building and then heard multiple shots being fired. Shortly thereafter Rosario saw the defendant leave the building. The defendant inserted a gun into his waistband and said in Spanish, "What did I do?" During this time, Valdo still was with Rosario.[6] The gunshots woke up Vilmarie to an asthma attack. Valdo left the apartment, but soon returned to report that he thought that the victim was dead. Rosario asked Valdo to leave. Rosario tended to Vilmarie and claimed that he did not hear police knocking on his door. He subsequently identified the defendant in a photographic array as the man with the gun that night.

The police later learned about the defendant's whereabouts prior to the shooting. The defendant had gone out for the evening with Yanelly, her sister Leisa, and Cordeiro to a nightclub in Providence, Rhode Island. On the way home, the defendant received a cellular telephone call and during the conversation stated, "Nobody mess with my boy," and "I'm going to kill him." The defendant had a silver gun in his hands. Yanelly told the defendant, "Think about it," and not to kill anyone. Soon after the group returned to Yanelly and Cordeiro's apartment,

---

[5] The SJC inserted a footnote which read: "Liz initially lied to police and created a false alibi for the defendant. After she was arrested, she told 'the whole story.' She pleaded guilty to a charge of intimidating a witness and received probation, on condition that she testify at trial."

[6] The SJC inserted a footnote which read: "Valdo was too drunk to recall what had occurred. He testified that he knew the defendant, but not 'that well,' and that he never had a conversation with him. Valdo did not hear any shots."

the defendant left.[7] Just after the defendant left, Yanelly and Leisa heard gunshots in the apartment above them. Yanelly looked outside and saw the defendant walk toward a dumpster. She then lost sight of him.

Police recovered seven discharged .22 caliber cartridge casings and two live projectiles from St. Pierre's apartment. Two spent .22 caliber rounds were recovered from the medical examiner's office. The Commonwealth's firearms identification expert opined that, based on his examination, all seven of the discharged .22 caliber cartridge casings recovered were fired from the same unknown weapon. There was no forensic evidence connecting the defendant to the shooting.

The defendant did not testify or call any witnesses. The defense was misidentification. The jury were instructed fully concerning how to assess the various identifications made.

Commonwealth v. Borgos, 979 N.E.2d 1095, 1097-1100 (Mass. 2012).

II.     Procedural Background

Petitioner moved to suppress and exclude from use any and all evidence seized from the identifications obtained as a result of unduly suggestive and unconstitutional identification procedures. Suppl. App. ("S.A.") 138. Sharon St. Pierre, Eduardo Rosario, Vilmarie Maldonado, Sheena Castle, Detective Timothy Albin, and Detective John McDonald testified at a hearing on the motion. The motion judge denied Petitioner's motion to suppress as to the out of court identifications made by St. Pierre, Castle, Rosario and Maldonado, but granted Petitioner's motion as to Mark Cleaves. Id. at 161.

A jury convicted Petitioner of first degree murder on the theory of deliberate premeditation. Borgos, 979 N.E.2d at 1097. Petitioner appealed his conviction and sought review on the basis of Mass. Gen. Laws ch. 278 § 33E. The SJC affirmed the conviction, and declined to

---

[7] The SJC inserted a footnote which read: "Yanelly and Leisa separately identified the defendant as the person who had been with them before the shooting."

4

exercise its authority under § 33E on December 21, 2012. Id. Petitioner filed his petition for a writ of habeas corpus with this court on October 28, 2013. Pet. [#1].

III.     Legal Standard

When a petitioner properly exhausts a claim in state court, this court must defer to the state court's adjudication unless it "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

"Clearly established Federal law" includes only Supreme Court holdings, as opposed to dicta, at the time of the state court's decision. Carey v. Musladin, 549 U.S. 70, 74 (2006); Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court adjudication made "contrary to" clearly established federal law "applies a rule different from the governing law set forth in [Supreme Court] cases, or . . . decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002); Williams, 529 U.S. at 405-06. The decision involves an "unreasonable application" of clearly established federal law "when the state court identifies the correct legal principle, 'but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply.'" Malone v. Clark, 536 F.3d 54, 63 (1st Cir. 2008) (quoting Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007)).

If the state court's decision was contrary to or an unreasonable application of clearly established federal law, this court must conduct a *de novo* review of the claim. Aspen v. Bissonette, 480 F.3d 571, 576 (1st Cir. 2007). Under this review, Petitioner "must show that his underlying detention is unlawful and not just that the state court employed faulty reasoning in his case." Id. The state court's findings of fact are presumed correct. 28 U.S.C. § 2254(e)(1). "[F]acts" for this purpose "are defined as 'basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.'" Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (quoting Bryson v. Ward, 187 F.3d 1193, 1211 (10th Cir. 1999)). Petitioner must provide clear and convincing evidence to rebut this presumption. 28 U.S.C. § 2254(e)(1).

IV. Discussion

    A. *Out of Court Identification Procedures*

Petitioner contends that the SJC erred in finding that the out-of-court identification procedures were not unreasonably suggestive. Mem. Supp. Pet. 13 [#23]. Specifically, Petitioner alleges that (1) Detective John McDonald drew attention to Petitioner's photograph by covering his hair, id., (2) police told eyewitnesses that a suspect was in custody or that Petitioner's photo would be in the array, id., and (3) police told eyewitnesses that Petitioner's photo came from a Puerto Rican document, id. at 22. Taken together, Petitioner asserts that these unreasonably suggestive procedures deprived him of his due process rights. Id. at 13.

The Supreme Court has held that an out-of-court identification based on a photo array must be suppressed as a matter of due process "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Neil v. Biggers, 409 U.S. 188, 197 (1972). Due process concerns are triggered by "police use of an unnecessarily suggestive identification procedure, whether or not

they intended the arranged procedure to be suggestive." Perry v. New Hampshire, 565 U.S. 228, 232 n.1 (2012). To determine suggestiveness, the court examines the nature of the procedures utilized by police. Id. at 238-40. Determining if a suggestive procedure occurred is ultimately a fact specific determination. Id.

The danger of suggestive identification procedures is "lessened by cross-examination at trial." Simmons v. United States, 390 U.S. 377, 384 (1968). "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence will ordinarily be admitted, and the jury will ultimately determine its worth." Perry, 565 U.S. at 232. A misidentification is irreparable when "trial mechanisms would not help a jury distinguish between reliable and unreliable identifications." United States v. Correa-Osorio, 784 F.3d 11, 19 (1st Cir. 2015) (citing Biggers, 409 U.S. at 197; Mason v. Brathwaite, 432 U.S. 98, 116 (1977)).

If improper state conduct is not alleged, the Constitution prohibits convictions "based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Perry, 565 U.S. at 237. Ultimately, the jury determines the reliability of evidence presented at trial. See id. (citing Kansas v. Ventris, 556 U.S. 586, 594 (2009)); Brathwaite, 432 U.S. at 116 ("We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

a. Petitioner's Claim that Detective McDonald's Action in Covering Petitioner's Hair Was an Unreasonably Suggestive Procedure

Petitioner alleges that Detective John McDonald ("Det. McDonald") impermissibly highlighted his photograph in the course of the photographic array by covering his hair. Det. McDonald testified at the suppression hearing as to at least four different arrays he showed to various witnesses between May 12, 2007 and June 12, 2007. S.A. 372, 389-92, 399-412, 415-16, 419-21, 426, 428-30, 432-34. Det. McDonald testified that on the morning after the murder, St. Pierre and Castle were shown a photo array of some of the residents that lived at the address of the murder. Id. at 389. Petitioner's photograph was not in this array.

St. Pierre testified at the suppression hearing that she was shown a photographic array at the police station the morning after the murder. Id. at 217. She testified that she told police the photo array did not include a picture of the shooter, but "[t]here was a picture that they were pushing at me, which I knew wasn't him, but I ended up saying that it was." Id. at 218. Castle likewise testified that she saw groups of photographs while she was at the police station on the morning after the murder. Id. at 356-57. She also testified that she was "not sure on any of them," but that the police kept trying to force her to pick a picture. Id. at 357. Both St. Pierre and Castle picked a picture on the morning of the murder, but neither picture was of Petitioner.

A few days later, Det. McDonald showed Castle and St. Pierre another photo array. Id. at 389, 420. Petitioner's photograph was not included in that array, and St. Pierre and Castle each picked Rosario's picture as being the person who looked the most like the shooter. On May 24, 2007, after Rosario had been questioned and had identified Petitioner as the person who killed Woodard, Det. McDonald requested another array be compiled that would include a photograph of Petitioner. Id. at 399-400. This array was created by Detective Timothy Albin ("Det. Albin"). Id. at 332. To create the array Det. Albin entered five criteria (age, height, hair color, race and

8

sex) into the Fall River Police Department's database which produced a wide range of photographs. Id. at 333-34. Det. Albin selected photos that were similar in characteristic features, and cropped them so that they would not stand out from another photo. Id. at 334, 338. The photo array created on May 24, 2007, included a photograph of Petitioner from his Puerto Rican voter identification card. Id. at 309, 399-400. Det. McDonald showed this photo array to Rosario, Maldonado, St. Pierre, Castle, and Mark Cleaves. Id. at 403-11. Rosario, Maldonado, St. Pierre and Castle each identified Petitioner's photograph as being the person who looked like the shooter. After Petitioner was arrested, another photo array was created by Det. Albin. This array contained the booking photo of Petitioner. Id. at 338-39. This array was shown to St. Pierre, Castle and Mark Cleaves. St. Pierre and Castle both identified Petitioner's photo as being the person who looked like the shooter.[8]

Det. McDonald prefaced each identification by asking the witness to concentrate on the facial features of the individuals in the photographs, and to be advised that a person's hair length and style, and facial hair, can change. Id. at 402, 405-06, 408, 412 ("I prefaced her with the same thing. 'Concentrate on the physical features. Hair can change, facial hair. Pick up the photos if you want. You can turn them over if you're sure it's definitely not somebody. Just let us know if there's somebody there you recognize.'"). Four of the witnesses, Rosario, Maldonado, St. Pierre and Castle identified Petitioner's photograph when shown the array that contained his voter identification card picture. After Rosario, Maldonado and St. Pierre picked Petitioner's picture, Det. McDonald covered the top of Petitioner's photograph and asked them to confirm their pick.

---

[8] Mark Cleaves also identified Petitioner's photograph, but the motion judge excluded this identification from being used at trial because Cleaves stated that he had seen Petitioner's photo on the news prior to having been shown the photo array. S.A. 416, 160-61.

9

Id. at 403, 404, 406, 409. Det. McDonald did not cover the top of Petitioner's photograph following Castle's identification. Id. at 412.

The SJC rejected Petitioner's contention that "the police brought unreasonably suggestive attention to the defendant's photograph by covering his hair." Borgos, 979 N.E.2d at 1104. The SJC determined that the testimony was uncontested that the "police did not 'block' the defendant's hair as depicted in the photograph until *after* a positive identification had been made by the witness, which initial identification did not draw attention at all to the defendant's hair." Id. (emphasis original).

The SJC properly applied federal law in determining that Det. McDonald's actions to cover the top of Petitioner's photograph were not so unduly suggestive as to violate due process, and the decision to admit the subsequent identifications is not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). The SJC determined that police blocked Petitioner's hair only after each witness positively identified Petitioner, and was therefore not so suggestive as to deny Petitioner due process of law. See Borgos, 979 N.E.2d at 1095. This was a reasonable determination based on clearly established Supreme Court precedent. The evidence supports that each witness independently identified Petitioner, and therefore blocking the top of Petitioner's photograph was not suggestive. Further, the weight of each identification could be properly challenged through cross-examination at trial, as Supreme Court precedent prescribes. Petitioner has not established that covering the hair was so "unnecessarily suggestive" as to merit exclusion on due process grounds.

    b. Petitioner's Claim that Police Told Eyewitnesses that a Suspect Was in Custody or that Petitioner's Photo Would Be in the Array

Petitioner also alleges impermissibly suggestive procedures because identification witnesses were either aware that a suspect was in custody or that a suspect's photograph would

be in the array. Petitioner alleges that St. Pierre was aware that "police knew who the shooter was and had a suspect in custody." Mem. Supp. Pet. 22 [#23]. Petitioner also alleges that Rosario knew that a photograph of the suspect would be in the array. Id. at 22-23. To support his claim, Petitioner cites St. Pierre and Rosario's testimony from the motion to suppress hearing. Id. St. Pierre testified that police told her that they had arrested someone before showing her the array containing Petitioner's photograph, and Rosario testified that he knew Petitioner's photo would be in the array because police told him they were going to show him a photo from a Puerto Rican document. S.A. 221-24, 268.

This testimony was contradicted, however, by the testimony of Det. McDonald. Det. McDonald testified that neither he nor any other detective indicated that there was a suspect when they showed the photo array to the witnesses. Id. at 402-03 ("Q: Now, prior to Mr. Rosario looking at those photographs, did you indicate to him that you had a suspect in mind? A: No."). Det. McDonald also testified that a warrant was issued for Petitioner on May 25, the day after St. Pierre identified Petitioner from the array, and that he did not tell St. Pierre that there was a warrant out either before or after showing her the array. Id. at 413. Det. McDonald further testified that Petitioner was arrested on June 5, 2007, almost two weeks after St. Pierre saw the array. Id. In evaluating this testimony, the SJC found that the motion judge credited McDonald's testimony that he did not reveal "that there was a suspect in custody or in mind, or otherwise improperly suggest that the shooter's photograph was in the array." Borgos, 979 N.E.2d at 1104.

The SJC's factual determination to credit Det. McDonald's testimony is entitled to considerable deference under AEDPA. See Sleeper, 510 F.3d at 38 (citing Sanna, 265 F.3d at 7) (explaining that § 2254(e)(1)'s presumption of correctness for factual findings applies to State court determinations of witness credibility). Petitioner has not provided clear and convincing

11

evidence to overcome the presumption of correctness in § 2254(e)(1). While Petitioner points to testimony at the motion to suppress hearing from Rosario and Maldonado directly conflicting Det. McDonald's testimony, the state court weighed and rejected the conflicting testimony. As a result, Petitioner has not established clear and convincing evidence rebutting the presumption that either identification witness was aware that a suspect was in custody or that a suspect's photograph would be in the photographic array.

      c. Petitioner's Claim that Police Told Eyewitnesses that Petitioner's Photo Was from a Puerto Rican Document

Petitioner also alleges that the photographic array was impermissibly suggestive because identification witnesses were aware that the suspect's photograph would be a Puerto Rican document. Petitioner alleges that both Rosario and Maldonado were aware that "an updated photograph from Puerto Rico would be in the array." Mem. Supp. Pet. 23 [#23]. Rosario also testified that his wife, Maldonado, knew that police intended to show them a photo from Puerto Rico. S.A. 286. Further, Petitioner alleges that Maldonado identified Petitioner because she "recognized the photograph as being from a voting card from Puerto Rico because she had a similar card." Mem. Supp. Pet. 23 [#23].

During the hearing on the motion to suppress, Rosario stated that he was aware that police had obtained a photograph of the suspect from Puerto Rico. S.A. 268 ("They said, 'Well, we're going to wait a few days. They're going to bring me pictures from Puerto Rico, and then you're going to point out him.'"). In contrast, Maldonado testified that she identified Petitioner initially and only then recognized that the photograph was from a Puerto Rican voter's card because "I'm from Puerto Rico, and that photograph was made for the voter's card, and it looked old." Id. at 309, 312.

12

Petitioner has not presented sufficient evidence that Det. McDonald impermissibly highlighted Petitioner's photograph. The SJC credited the motion judge's finding that Det. McDonald did not tell any of the witnesses that he was waiting for a photograph from Puerto Rico. Det. McDonald denied that he or any other detective told Rosario that police were waiting for a photograph from Puerto Rico, id. at 400-01, and he could not recall if there was anything in Petitioner's "photograph that depicted that it was from a license or maybe an election card," id. at 426. The SJC also found that police took steps to ensure that the suspect's photograph was cropped to be the "same size as the other [photographs] used [sic] the array." Borgos, 979 N.E.2d at 1101.

The SJC's determination is presumed to be correct under § 2254(e)(1) of the AEDPA. See Sleeper, 510 F.3d at 38 (citing Sanna, 265 F.3d at 7). It is insufficient to point to testimony from Maldonado and Rosario that conflicts with McDonald's testimony because each witness's testimony was weighed and reviewed both by the motion judge and the SJC. "Although there was conflicting testimony concerning these facts, the judge, based on his conclusions, implicitly credited the testimony of Det. McDonald that he did not tell the witnesses that he was awaiting a photograph from Puerto Rico, that there was a suspect in custody or in mind, or otherwise improperly suggest that the shooter's photograph was in the array." Borgos, 979 N.E.2d at 1104. Petitioner has failed to provide clear and convincing evidence sufficient to rebut the presumption of correctness. 28 U.S.C. § 2254(e)(1).

Further, Petitioner has not met his burden to establish that the SJC unreasonably applied clearly established federal law in finding that the photographic array was not impermissibly suggestive. There is no indication that Petitioner's photograph impermissibly stood out from the other photographs because it originated from a Puerto Rican document. Further, the SJC credited

13

the testimony of Det. Albin, who stated that Petitioner's photograph was appropriately similar to the other photographs in the array. Borgos, 979 N.E.2d at 1101; S.A. 338 ("[W]e'll try to crop them so they don't stand out from another photo size."). Even Maldonado's testimony states that she first identified Petitioner then recognized the source of Petitioner's photograph. S.A. 312 ("I saw the photograph, and I recognized [Petitioner], and that was the first thing, and then after that I saw that it was a voting card."). Thus there is no indication that Petitioner's photograph impermissibly stood out from the other photographs in the array. Petitioner has therefore not established that using a photograph originating from Puerto Rico constituted an unreasonably suggestive identification procedure and a violation of due process.

  B. *Reliability of Eyewitness Testimony*

    a. Petitioner's Claim that St. Pierre and Castle Were Unreliable Witnesses

Petitioner alleges that admitting the testimony of Castle and St. Pierre was impermissible because this evidence was inherently unreliable. Both St. Pierre and Castle initially identified the wrong suspect. Mem. Supp. Pet. 21-22 [#23]; Borgos, 979 N.E.2d at 1100-01("Based on this information, that day and over the weekend, officers showed a series of photographs (none of which was of the defendant) to St. Pierre and Castle. Both selected Rosario's photograph as being someone who looked like the shooter."). Petitioner also alleges that St. Pierre was an unreliable witness because she lied to police about calling 911, Borgos, 979 N.E.2d at 1098 ("St. Pierre lied to the officers, telling them that her granddaughter had made the telephone call while she was 'playing with the phone.'"); she testified inconsistently about observing the Petitioner around the apartment complex, Mem. Supp. Pet. 18-19 [#23]; S.A. 215-16 (discussing St. Pierre's initial testimony that she had seen "Jose" around the complex for about a year when she later claimed to have seen him "for at least six months"); and she had been pressured to make an

14

initial identification, Mem. Supp. Pet. 19 [#23]; S.A. 975-76 ("Like I said, the picture was kind of pushed at me. I don't remember if the pol – if the – if they pushed this picture out or what."). The SJC determined that these incidents affected St. Pierre's "credibility as a witness, which was assessed by the motion judge and was available as fodder for cross-examination." Borgos, 979 N.E.2d at 1103-04.

Petitioner likewise challenges the reliability of Castle's identification and eyewitness testimony because there was a high risk that Castle misidentified Petitioner. Mem. Supp. Pet. 19-21 [#23]. He argues that the evidence was unreliable because Castle had been awake continually for thirty hours, had only seen the perpetrator briefly at the time of the shooting, and had claimed never to have seen Petitioner before that evening. Id. at 21. Petitioner emphasizes that Castle had inconsistently described how often she had seen Petitioner. Id. at 20; S.A. 418-19 ("And prior to interviewing Sheena Castle, did you learn from is it Officer Nelson Sousa that she had indicated that all she could say was he was Hispanic, 5'7", and had never seen him before?"). The SJC considered these challenges and rejected them because the motion judge weighed Castle's interactions with Petitioner, determined that there was "no evidence or argument that she then was physically or emotionally unable to make an identification," and "Castle testified that she was one hundred per cent certain about her identification of the defendant." Borgos, 979 N.E.2d at 1103-04.

Although Petitioner calls into question both the eyewitness testimony of Castle and St. Pierre, the reliability of and the weight given to the evidence is to be determined by the jury rather than screened by the court. Perry, 565 U.S. at 233. Potentially unreliable eyewitness evidence should be addressed "through the rights and opportunities generally designed for that purpose" including cross-examination and tailored jury instructions. Id. These safeguards are

15

governed by state evidence rules guiding admissibility decisions. See Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983) (citing Spencer v. Texas, 385 U.S. 554, 564 (1967)) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules: 'It has never been thought that [decisions under the Due Process Clause] establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure.'").

Petitioner points to flaws in Castle and St. Pierre's testimony that affect credibility rather than the admissibility of the eyewitness identifications. The credibility determination of the SJC is entitled to AEDPA's presumption of correctness under § 2254(e)(1). See Sleeper, 510 F.3d at 38 (quoting Sanna, 265 F.3d at 7). The SJC appropriately considered the nature of the eyewitness testimony and those factors determining the credibility of the identification.

b. Petitioner's Claim that Using Eyewitness Testimony is Inherently Unreliable

Petitioner finally alleges that eyewitness testimony is inherently unreliable and should not have been the only evidence supporting Petitioner's conviction. Mem. Supp. Pet. 16-18 [#23]. In support of this proposition, Petitioner cites a number of law review articles and United States v. Wade, 388 U.S. 218, 229 (1967) ("[T]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined."). Rather than completely barring eyewitness testimony, Wade required that the reviewing court evaluate police procedures to determine the independence of an eyewitness's testimony. See Wade, 388 U.S. at 228-29; Cooper v. Picard, 428 F.2d 1351, 1354 (1st Cir. 1970); Perry, 565 U.S. at 242 ("In fact, the risk of police rigging was the very danger to which the Court responded in Wade when it

recognized a defendant's right to counsel at postindictment, police-organized identification procedures.").

Despite Petitioner's contentions, courts have consistently upheld the use of eyewitness testimony. See Perry, 565 U.S. at 237 ("The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit."); Correa-Osorio, 784 F.3d at 29 ("Eyewitness testimony is undeniably powerful."); United States v. Henderson, 320 F.3d 92, 99 (1st Cir. 2003) (quoting Simmons, 390 U.S. at 384) ("Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs.").

V.  Conclusion

For the foregoing reasons, Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by Person in State Custody [#1] is DENIED.

IT IS SO ORDERED.


Date: April 20, 2017                                  /s/ Indira Talwani
                                                     United States District Judge